UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

STEVEN WAYNE PUMPER,
    Petitioner/Defendant,

vs.

UNITED STATES OF AMERICA,
    Respondent.
_____/

CRIMINAL ACTION NO.

1:09-CR-00317-SL

DEFENDANT'S MOTION VACATE, SET ASIDE HIS CONVICTION AND

FORFEITURE PROCEEDING PURSUANT TO 28 U.S.C. SECTION 2255

    NOW COMES, the Defendant, Steven W. Pumper, pro-se, and does hereby move this Honorable Court for an Order Vacating, Setting Aside and/or Amending Defendant's Conviction/Sentence and the Court's Restitution judgment to the extent that said such Conviction/Sentence and Restitution judgment were derived in a manner and by means violative of Defendant's Constitutional right to legal due process, jury trial, and proof beyond a reasonable doubt; and further Defendant seeks to be resentenced in a Constitutional manner as set forth herein and in support thereof, the Defendant states and shows as follows:

PRELIMINARY STATEMENT

    As a preliminary matter, the Defendant avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions and/or memorandums. The Defendant gives notice of such limitations and prays the Court to construe his pleading liberally in light of the United States Supreme Court's holding in Haines v. Kerner, 404 U.S. 519, 30 L. Ed.2d 652 (1972). Further, the allegations and averments in a pro-se pleading must be taken as true and construed in favor of the Defendant. See Malone v. Colyer, 750 F. 2d 258, 260 (6th Cir. 1983).

## JURISDICTION AND TIMELINE

Jurisdiction is proper in the Defendant's District Court pursuant to the procedure set forth in 25 U.S.C. Section 2225. The Defendant relies on the Antiterrorism and Effective Death Penalty Act of 1996("AEDPA") as contained in 28 U.S.C. section 2255(f)(2), (3), and (4). Which provides in part That: "A one year period of limitations shall apply to a motion under this section. The Limitation Period shall run from the latest of--(2) The date on which the impediment to making a motion created by government action in violation of the Constitution or Laws of the United States; (4) "The date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."

"A motion filed pursuant to 28 U.S.C 2255 is subject to a one-year statute of limitations, with the limitations period beginning to run 'from the latest of' four possible dates. Benitez v. United States, 521 F.3d 625, 629 (6th Cir. 2008). At issue in this case is whether Jefferson filed his claims within one year of "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. 2255(f)(4). This standard "does not require the maximum feasible diligence, only due, or reasonable, diligence." DiCenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006)(internal quotation marks omitted). '"(T)he petitioner bears the burden of proving that he exercised due diligence.'" Johnson v. United States, 457 F. App'x 462, 468 (6th Cir. 2012)(quoting DiCenzi, 452 F. 3d at 471).

A review of the Docket Sheet will reveal that the Petitioner has demonstrated due diligence in attempting to obtain evidence in support of his unripe ineffective assistance of counsel and prosecutorial misconduct claims. Also see Petitioner's exhibit [A].

## BACKGROUND OF THE CASE

In 2007, the United States launched a wide-ranging investigation into public corruption in Cuyahoga County, Ohio. Prosecutors sought and received authorization to wiretap nine phones. Over the course of eight months, the Government intercepted more than 44,000 conversations, and seized "a small mountain" of documentary materials. The primary targets of the investigation were Frank Russo, the County Auditor, and James Dimora, the County Commissioner and Democratic Party Chairman, both of whom were ultimately indicted for public-corruption offenses.

On May 23, 2008, Petitioner met Bob Quavis at Boston Market to give him two thousand dollars. As Petitioner exited the restaurant, two Federal agents approached him and said that "he was not under arrest and that they wanted to talk to him." Petitioner followed the agents to their car. At which point, the agents said that they know that the two thousand dollars giving to Bob Quavis was a bribe. Petitioner responded that the money was not a bribe, but rather a loan. Agents said, that they wanted Petitioner to work with the Government and wear a wire and camera. They gave the Petitioner until the next morning to make up his mind about working with the Government and should by no mean speak with anyone about the meeting or face being formally charged with bribery.

Petitioner, thereafter, got in touch with his friend Rick Capone, who had a friend that was an attorney that understood Federal Law. Attorney George Argie met with Petitioner later that night and took notes and said that he would call Jim Dimora in the morning to see what was happening. He also said that he would call the Government to let them know that he was representing Petitioner in this matter as George Argie called to relay to the Petitioner that afternoon that the reply from the AUSA said "since George Argie is representing Pumper, that the Government is not willing to move forward with Steve Pumper".

On July 28, 2008, Petitioner's office, home, and defense counsel's office were raided by Federal agents. Federal agents confiscated everything. Petitioner Thereafter, hired Attorney Brian Downey as legal counsel. Attorney Downey and his partner Attorney Nickie explained to the Petitioner that based on where the Feds were going with the case, that he needed to sit down with the Government and provide a full and detailed proffer session to case the risk of being indicted or pending up with a large prison sentence. Based on this legal advice, Petitioner decided to provide the proffer. Petitioner does remember the attorneys having him sign some documents prior to debriefings, but have no idea of their contents.

Several months later, after several debriefing sessions, on July 8, 2009, Petitioner was charged in a nine count information sheet based upon the information he had provided during the debriefing sessions. Thereafter, on July 17, 2009, Petitioner entered a guilty plea before the Honorable Kathleen M. O'Malley to all counts of the Information and the matter was referred for the preparation of a presentence investigation report. On or about November, 2009, the pre-sentencing report was completed

and the Petitioner's recommended sentence based on the report was 97 months of incarceration. However, the Government obtained a 4-year continuance of the sentencing hearing while Petitioner provided it substantial assistance in obtaining numerous post-agreement convictions of elected officials. That Post Plea Agreement assistance is detailed in Petitioner's Exhibit B. Petitioner was sentenced to 97 months on 12/4/2013. As set forth in July 17, 2009 plea agreement. Petitioner was not awarded any consideration of his post-agreement assistance to the Government at the time of sentencing for reasons undisclosed.

FIRST ISSUE:

DEFENDANT'S FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION
WAS VIOLATED WHEN THE U.S. ATTORNEY USED INFORMATION OBTAINED
DURING THE DEBRIEFING SESSIONS

Petitioner seeks a hearing, pursuant to Kastigar v. United States, 406 U.S. 441, 32 L. Ed. 2d 212, 92 S. Ct. 1653 (1972) ("Kastigar"), to determine whether the charges against him were the impermissible product of his immunized statements to the United States Attorney during the proffer sessions. In Kastigar, the Supreme Court held that the compelled testimony of a person who is under a grant of immunity cannot be used against that person in a subsequent criminal proceeding, and that the prosecution has the burden of proving affirmatively that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. See Kastigar 406 U.S. at 453.

STANDARD

To secure a criminal defendant's cooperation or plea, the Government may grant immunity in exchange for the defendant's cooperation. United States v. Pelletier, 898 F. 2d 297 (2d Cir. 1990). Immunity can take different forms. Transactional immunity which accords full immunity from prosecution for the offense to which the testimony relates; use immunity and derivative use immunity accord limited immunity from the use of testimony and evidence derived there from in a subsequent prosecution. Kastigar v. United States, 406 U.S. 441, 453, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972).

Further, immunity may be statutory in nature or less regimented. Under a grand of statutory immunity, the defendant is compelled to testify and, in exchange for the compelled testimony, "no testimony or other information may be used against the witness in any criminal case, except for prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." 18 U.S.C. 6002

When federal authorities later prosecute a defendant who was granted statutory immunity, the defendant can request a Kastigar hearing to require the Government to prove that immunized testimony was not used. Kastigar v. United States, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972). During this hearing, the Government bears the heavy burden of proving that all of the evidence it proposes to use was derived from a legitimate independent source.

Less formal immunity can be granted by local prosecutors pursuant to contracts, and the contracts themselves govern the extent of the immunity provided. See United States v. Turner, 936 F. 2d 221 (6th Cir. 1991). Because such immunity is contractual in nature, it is strongly influenced by the principles of contract law. In other words, the remedies available in the event of a breach, as well as the conditions constituting a breach, are governed by the agreement. Pelletier, 898 F. 2d at 301. A defendant granted this less formal immunity lacks the grounds for insisting on a Kastigar hearing as described above, and normal contract law and remedies govern the alleged breach by prosecutors.

"If a firm agreement has been entered into, the government bears the burden of proving that the defendant failed to satisfy his part of the deal." United States v. Fitch, 964 F. 2d 571, 574 (6th Cir. 1992). Specifically, the Government must prove that any breach was "material and substantial." Id.

The following is Petitioner's personal account of the information he provided to Federal authorities and how that information was used to support the counts against him.

Count # 1

James Dimora

1. Jim helped me make contact with Bridget McCaffrey(the Judge for the Letter Perfect Lawsuit) in which to help settle the case. McCaffery got me on a conference call with all attorneys on 5-5-2008, and we settled over the phone. I also testified against her.

2. Jim made a call to Domestic Child services to investigate my ex-wife, who was drinking all the time as she was in control

of my kids, and the kids could be at risk since they were 8 and 10 years old.

3. FEDS DID NOT KNOW, I pointed out to the feds of how the money transferred from me to Jim. I showed them in the quicken account of where to find the information. They had no clue of where to find that information. The feds did not know that I gave him any cash. I GAVE THEM THE FLASH DRIVE.

Harvey OPPMANN

4. I had Jimmy make a call on my behalf to the County to move along the paperwork for the closing of the property for Harvey Oppmann. I told Jim that I was getting 80K(I was really getting 250K) he would get 1/2 of the 80 less taxes that I had to pay. That was 366. This is were I helped the Feds locate the money I gave to Jimmy on my Quicken account.

5. I was coheres into saying that Jimmy helped on the funding for Alerton Apartments loans with the count. In all reality, my real estate attorney's were handling it. Since Jim was on the board, he did vote my way, but it would of been passed anyways. The feds said that since I was doing work on his house at the time that it was a quick pro quo.

6. Jim made a call to extend the loan on Alerton Apartments, 3 years, when the market dropped in 2008.

7. I showed the feds where the transactions were on the DAS books in which work was done on Jimmy's house.

8. I confirmed that I did do the sprinkler work on Dimora's house in 2002 for Free.

9. I provided the assistance with the fake contract I wrote for Jimmy D and how Michael Gabor was the in between.

10. On the Courtyard Square project, DAS did receive a contract of $24K for misc. work. Jim did make a call on the project but my Salesmen was already working with the lady. She used to work for my Salesperson in the past and had a great relationship.

11. I exposed the details between Michael Gabor, Jimmy and Green Source Products. I was going to bring Gabor on as a salesperson. Gabor would make commissions and then take a % of that and give it to Dimora on work he could help land for GSP. No work ever was done, and the GSP ownership group said they would not hire Gabor. I also provided the conversations of what happened at that meeting on 1-18-2008, when I walked Dimora and Gabor through the facility at GSP. I told them the arrangement of how Gabor would be put on with GSP and a certain amount of commission will be provided through Gabor to Dimora.

12. Jimmy made a call to my Divorce Judge to see if she could push the hearings a little faster to settle the case.

13. DAS provided all tickets for sporting events as well as dinners.

14. I told the Feds about what my conversations were with Jim and Doug Price at a lunch that I had set up with both parties. I wanted Jim to put a good word in with Doug for my company to work on 2 projects in which the County was providing some funding on.

15. I gave details about the lunch I had with Dimora and Voinovich (the Architect) on 4-1-08 of how we were going to specify the GSP panels on the Juvenile center.

Count # 2,3,4,5

1. I told the feds that 2K was a loan and not a bribe. It was a bribe.
2. I provide tickets to events to Bob as well as went with him to some games as well as lunches

TRULINCS 32320160 - PUMPER, STEVEN WAYNE - Unit: MRG-Q-A

---

FROM: 32320160
TO:
SUBJECT: next
DATE: 03/02/2016 09:57:22 AM

3. I reviewed recorded tapes when Bob came to my office to pick up tickets. Bob wore a wire and taped me.
 4. I identified a document in my safe in which I falsified that the money I gave Bob was a loan.
 5. I confirmed to the Government that I made calls to Bob to convince him that he should tell the Government it was a loan, after we were approached by the Government.

Count #6
KEVIN KELLEY
 1. I told the Government of the 6K bribe that I gave to Kevin Kelly.
 2. I told DAS to write a check to the Democratic party that would support Kevin in his re-election.
 3. Kevin helped DAS get a construction project. The project was 96K and DAS made 15K. I was hit with 15K restitution.
 4. I provided the info that Kelley was the go between with Russo, Dimora and others.

Count #7
SANDY KIMKOWSKI
 1. I provided an estimate of work that was done on Sandy's and her family's houses. It was about $20K. The Government had no Idea what was done.
 2. I provided the details how DAS would receive purchase orders by Maple Heights School, under 20K so we would not have to bid the projects.

Count #8
STRUCTURING
 1. The Government asked me if I knew that I was taking money out of my bank and staring under 10K as required by reporting. They said it is my responsibility to notify the bank of such withdraws.

Count #9
PAT BOYCE - PHILIPS MEDICAL
 1. I confirmed that Boyce had called me looking for (2) bribes. Both Bribes never took place.
 2. I provided information on other employees in which received work on the dime of Philips medical for their own use.
 3. I provided information on where to find the work that was changed under the DAD accounting files. The Government were los on this.
 4. I was able to argue on the amount of loss Philips had, but my Attorney Downey told me not to so I wouldn't upset the Judge and the Prosecutors. So we didn't argue and they gave me the max profit I made from Philips, from 2002 to 2008 of 1.7 million for restitution. Which also increased my level for sentencing. Total amount of bribes should of been around 60. Pat Boyce and ken Grabowski were given probation. No others were charged.

Before the filing of the criminal information in this case, counsel for the Petitioner and for the Government communicated about the investigation and pending prosecution. These discussion led to several proffer sessions. The Government provided a proffer agreement that defined the terms of the proffer sessions, and Petitioner, his counsel, and the Government all signed it. The key provisions of the agreement include: "no statements made or other information provided by your client during the proffer will be used directly against him in any criminal trial, unless it involves the commission of a crime of violence or a prosecution for perjury, making false statement or obstruction of justice." See exhibit [H]; also see United States v. Pielago, 135 F. 3d 703 (11th Cir. 1998)("Any ambiguities in the terms of a written proffer agreement should be resolved in favor of the criminal defendant."). The agreement establishes a background principle that no statements or evidence made and or produce by the Petitioner will be use against him unless it falls under an exception established by paragraph 2 through 4. The dispute here centers on the exception carved out by paragraph 2. In interpreting this agreement, the Court should employ the traditional tools of contract interpretation. See United States v. Fitch, 964 F. 2d 571, 574 (6th Cir. 1992).

In cases where a witness has been given use immunity, there is a "total prohibition on use" of that evidence, which "provides a comprehensive safeguard, barring the use of compelled testimony as an investigatory lead, and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." Kastigar 406 U.S. at 460. Petitioner was given use and derived use immunity for the statements he gave to federal agents when debriefed in this matter, therefore, the prosecution were barred from using any evidence obtained from the debriefing sessions against Petitioner or as an investigatory lead. If it has done so, this Court must consider whether the use of the information was completely harmless or if dismissal of the information is appropriate.

SECOND ISSUE:

> WHETHER DEFENDANT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL WAS LEGALLY ABSENT DURING DEBRIEFING SESSIONS WITH GOVERNMENT'S AGENTS?

Prior to the filing of the information on various bribery-related charges and without having entered into a plea agreement with the Government, Petitioner on the advice from trial counsel participated in several sessions during which he was required to waive his Fifth Amendment privilege against self-incrimination and debriefed the Government on the details of the crimes to with which he was later charged. The Petitioner was given no legal advice prior or during the debriefing sessions other than to simply tell the truth, nor was Petitioner advised of his Miranda rights. See Petitioner's exhibit [H].

It is undisputed that no legal advice was given to the Petitioner during the several pre-information debriefing sessions. Petitioner believes that these debriefing sessions were a "critical stage" of the proceedings, and the Court should presume that the Petitioner was prejudiced by his counsel's absence and therefore was deprived of his Sixth Amendment right to effective assistance of counsel pursuant to United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

Claims of ineffective assistance of counsel generally are reviewed under the well-established test set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which requires the petitioner to show that the counsel's performance was both deficient and prejudicial to the defense. "it is well settled," however, "that a complete absence of counsel at a critical stage of a criminal proceeding is a per se Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error." Van v. Jones, 475 F.3d 292, 311-12 (6th Cir.2007). In Cronic, decided the same day as Strickland, "the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir.2003)(quoting Cronic, 466 U.S. at 659 n.25). Therefore, while the Strickland test "provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed," including the absence of counsel during a critical stage of the proceedings. Id. (quoting Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed. 2d 389 (2000)).

The Supreme Court has not laid out a "a comprehensive and final one-line definition of "critical stage." Van, 475 F.3d at 312. Most recently, the Court stated that a critical stage is "a step of a criminal proceeding...that h(olds) significant consequences for the accused." Bell v. Cone, 535 U.S. 685, 696, 122 S. Ct. 1843, 152 L.Ed.2d 914 (2002). A critical stage is one at which "(a) available defenses may be irretrievably lost, " Hamilton v. Alabama, 368 U.S. 52, 53, 82 S. Ct. 157, 7 L.Ed. 2d 114 (1961), and

"where rights are preserved or lost," White v. Maryland, 373 U.S. 59, 60, 83 S. Ct. 1050 10 L. Ed. 2d 193 (1963). The Court has emphasized that the determination requires "an analysis whether potential substantial prejudice to defendant's rights inhered in the...confrontation and the ability of counsel to help avoid that prejudice." Coleman v. Alabama, 399 U.S. 1, 9, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970)(alteration in original)(quoting United States v. Wade, 388 U.S. 218, 227, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967)). A court also should consider whether the stage is adversarial in nature so that "the accused required aid in coping with legal problems or assistance in meeting his adversary." United States v. Ash, 413 U.S. 300,313, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973). A variety of post-indictment, pretrial proceedings have been found to be "critical stages." See, e.g., Michigan v. Jackson, 475 U.S. 625, 629-30, 106 S. Ct. 1404, 89 L. Ed. 2d 631(1986)(noting that, after arraignment, "government efforts to elicit information from the accused, including interrogation, represent 'critical stages' at which the Sixth Amendment applies"), overruled on other grounds, Montejo v. Louisiana, __U.S.__, 129 S. Ct. 2079, 2085, 173 L. Ed. 2d 955 (2009); King v. Bobby, 433 F. 3d 483, 490 (6th Cir. 2006)("Plea negotiations, guilty plea hearings, and sentencing hearings are all 'critical stages' at which the right to counsel attaches."). Because government debriefings may hold significant consequences for the accused with respect to waiver of his or her Fifth Amendment right against self-incrimination, negotiation of a plea agreement, and sentencing, Petitioner believes that pre-inidictment debriefings are a critical stage for purposes of the Sixth Amendment.

In Estelle v. Smith, the Supreme Court emphasized the importance of counsel when a defendant considers waiving his or her Fifth Amendment right against self-incrimination: "Because '(a) layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege,' the assertion of that right ' often depends upon legal advice from someone who is trained and skilled in the subject matter.'" 451 U.S. 454, 471, 101 S. Ct. 1866, 68 L. Ed. 2d 359(1981) (first alteration in original)(quoting Maness v. Meyers, 419 U.S. 449, 466, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975)). The Court concluded that consent to a psychiatric interview was a critical stage in pretrial proceedings such that the defendant's Sixth Amendment right to counsel was violated when the defendant was not given an opportunity to consult with his counsel before participating in a psychiatric examination. Although the repercussions of a psychiatric examination may be different from those of debriefing sessions, both involve the defendant's decision to waive certain Fifth Amendment rights, and in both circumstances " a defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.'" Id. (quoting Powell v. Alabama, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L.Ed. 158 (1932)).

Aside from the waiver of the Fifth Amendment right against self-incrimination, debriefings hold the potential for prejudice to the accused which may be avoided with the assistance of counsel. In United States v. Ming He, 94 F. 3d 782 (2nd Cir. 1996), the Second Circuit discussed at length the important role of counsel at debriefing sessions held after the defendant had, with the assistance of counsel, pleaded guilty and signed a cooperation letter. Although the court did not reach the underlying Sixth Amendment issue, the court used its supervisory powers to conclude "that cooperating witnesses are entitled to have counsel present at debriefings, unless they explicitly waive such assistance." Id. at 793. Rejecting the government's argument that "a debriefing session is a minor event and that defense counsel would of necessity be limited to giving advice principally about matters of fact, "the court discussed several ways in which counsel's assistance may be crucial at a debriefing session. Id. at 789. "First, a lawyer can explain the government's questions while also keeping her client calm, "preventing the defendant from "blurt(ing) out unthinking answers." Id. "Second, a lawyer can keep the client focused on the fact that while he is seeking the assistance and protection of the government, that entity does not share the defendant's interests even after the execution of a cooperation agreement." Id. at 790. Contrary to the government's argument in this case, the court noted a debriefing is an adversarial proceeding, because "the defendant's rights have not been fully adjudicated." Id. "Third, in this setting, a defense attorney might help resolve potential disagreements between the government and the defendant in clarifying his answers to ensure they are complete and accurate." Id. Fourth, "defense counsel can serve as a potential witness at sentencing to the fact that her client fully performed the promise he made to the government." Id. Finally, the court noted that the outcome of the debriefing sessions would impact whether the government made a motion for a downward departure under 5K1.1 of the United States Sentencing Guidelines, "a motion that has a critical effect on the amount of time defendant will serve in prison":

Most significantly, the refusal by the government to make such a motion is ordinarily unreviewable. The special nature of a 5K1.1 motion demonstrates that the government debriefing interview is crucial to a cooperation witness. To send a defendant into this perilous setting without effective assistance is, as Petitioner see it, inconsistent with the fair administration of justice.

All of these reasons make clear that Petitioner debriefing sessions were adversarial in nature and also were stages at which aspects of Petitioner's Fifth Amendment right against self-incrimination were "irretrievably lost" Hamilton, 368 U.S. at 53. Moreover, the consequences that the debriefings had for the Petitioner were in many respects more substantial than other defendants because, unlike other post-indictment debriefings, Petitioner had not yet been charged with a crime nor had entered into a plea agreement when he was being debriefed. Therefore, not only was his future sentence dependent upon the debriefings, but the debriefings were crucial to future charges and/or the plea negotiations. Cf. King, 433 F. 3d at 490 (noting that plea negotiations are a critical stage of criminal proceedings); see also Lafler v. United States, 123 S. Ct. 2151 (2012) (same). Based on these debriefings, the Government would determine whether to charge the Petitioner, the terms of the plea

agreement and whether the Government would be willing to enter into a plea agreement at all. The

importants of the debriefings was exemplified by the fact that, after the debriefings had concluded, the Petitioner was indicted based upon the same information he have provided to the Government which was unknown prior to debriefings. That fact along hi-lighted the need for effective assistance of counsel during Petitioner's debriefing sessions. The mere fact that Petitioner had signed a proffer letter does not mean that the Government was no longer his adversary, and the debriefings surely held significant consequences for the Petitioner.

As set forth in Petitioner's prosecutorial misconduct claim above, the volume of unknown information given by the Petitioner during the pre-charge debriefing sessions was insurmountable. The information given, not only lead to the indictment and conviction of over 50 public officials and others, the information also provided the basis for the nine charges filed against the Petitioner.

At no point in the pre-debriefings discussions with Petition did trial counsel ever advise him that he had an express Fifth Amendment right against self-incrimination nor the boundaries of his Fifth Amendment privilege and that debriefing without the cover of full immunity could subjected the Petitioner to be criminally charged based upon the very debriefing sessions counsel was encouraging him to engage in. Under these circumstances and given the severity of the situation, for trial and counsel to provide no legal advice whatsoever other than to simply tell the truth and everything will be ok, is the exact same thing as having no legal representation at all.

Petitioner recognizes that, in practice, some defense counsel may elect not to attend or be complacent during the debriefing sessions and that there may be benefits to the cooperation process if a defendant is able to meet with the Government without his counsel acting in his adversarial role. As at any other stage of criminal proceedings, however, a defendant may affirmatively waive his or her right to have effective counsel present during the debriefing sessions, as long as this waiver is made voluntarily, knowingly, and intelligently. See Estelle, 451 U.S. at 471 n. 16. In some cases, counsel may determine that the debriefings would proceed more smoothly without counsel present in a legal sense, and in such cases counsel may advise the defendant to waive his right to have counsel present at the debriefings. Here, there is no indication that Petitioner made any knowing and intelligent waiver of effective assistance of counsel during debriefings. Therefore, the Court should conclude that Petitioner's Sixth Amendment rights were violated by his counsel's callous throughout his debriefing sessions.

THIRD ISSUE:

> DEFENDANT WAS DENIED DUE PROCESS AND JURY TRIAL RIGHTS GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS OF THE CONSTITUTION WHEN HIS SENTENCE WAS ENHANCED BEYOND THE STATUTORY MAXIMUM BASED ON FACTS NOT FOUND BY A JURY BEYOND A REASONABLE DOUBT NOR SPECIFICALLY ADMITTED TO BY THE DEFENDANT

The Petitioner's present 97 months sentence was formulated by determining a starting base offense level relating to the charged counts of convictions and then adding additional levels (of punishment) for facts, conditions, and other circumstances alleged by the Government and then found by the Court to a preponderance of the evidence. This was unconstitutional. The act of judicial fact-finding of "elements" to a preponderance standard is, per se, unconstitutional and impermissible. See Blakely v Washington, 542 U.S. 296 (2004). The Framers envisioned the Sixth Amendment as a protection for defendants from the power of the Government. Accordingly, the Court should resentence the Petitioner.

In a steady stream of cases decided over the last 16 years, the United States Supreme Court has sought to identify the historical understanding of the Sixth Amendment jury trial right and determine how that understanding applies to modem sentencing practice. The Court's key sources in this task have been 19th-century treatises and common law cases identifying which facts qualified as "elements" of a crime, and therefore had to be alleged in the indictment and proved to a jury beyond a reasonable doubt. See Apprendi v. New Jersey, 550 U.S. 466, 476-483, n.15, 120 S. Ct. 2348, 147 L. Ed.2d 435 (2000) (collecting sources); id., at 501-518, 120 S. Ct. 2348, 147 L.Ed.2d 435 (Thomas, J., concurring)(same). With remarkable uniformity, those authorities provided that an element was "whatever is in law essential to the punishment sought to be inflicted." 1 J. Bishop, Criminal Procedure 50 (2d ed. 1872); see also Apprendi, supra, at 489, n. 15, 120 S. Ct. 2348, 147 L. Ed.2d 435 ("'[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted'" (quoting United States v. Reese, 92 U.S. 214, 232, 23 L. Ed. 563 (1876)(Clifford, J., dissenting))); 1 Bishop, supra, 87, at 55 (an indictment must include "any particular fact which the law makes essential to the punishment").

Judging that this common law rule best reflects what the Framers understood the Sixth Amendment jury right to protect, the Court has struck down sentencing schemes that were inconsistent with the rule. In Apprendi, for example, the defendant pleaded guilty to a crime that carried a maximum sentence of ten years. After his plea, however, the trial judge determined that the defendant had committed the crime with a biased purpose. Under a New Jersey law, that finding allowed the judge to impose up to ten additional years in prison. Exercising that authority, the judge sentenced the defendant to 12 years. 530 U.S., at 469-471, 120 S. Ct. 2348, 147 L. Ed. 2d 435.

Because the sentence was two years longer than would have been possible without the finding of bias, that finding was "essential to the punishment" imposed. 1 Bishop, supra, at 50; see Apprendi, 530 U.S., at 491-492, 120 S. Ct. 2348, 147 L. Ed.2d 435. Thus, in line with the common law rule, the Court held the New Jersey procedure unconstitutional. Id., at 497, 120 S. Ct. 2348, 147 L. Ed.2d 435. Subsequent cases have worked out how this principle applies in other contexts, such as capital sentencing regimes, state and federal sentencing guidelines, or criminal fines. See Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed.2d 556 (2002); Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed.2d 403 (2004); United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed.2d 62 (2005); Southern Union Co. v. United States, 567 U.S. __, 132 S. Ct. 2344, 183 L. Ed. 2d 318 (2012). Through all of them, the Court, has adhered to the rule, rooted in the common law understanding described above, that the Court laid down in Apprendi: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S., at 490, 120 S.Ct. 2348, 147 L. Ed.2d 435; see Blakely, supra, at 301, 124 S. Ct. 2531, 159 L. Ed.2d 403 (quoting above statement); (133 S.Ct. 2169) Booker, supra, at 231, 125 S. Ct. 738, 160 L. Ed. 2d 621(same); Southern Union Co., supra, at __, 132 S. Ct. 2344, 183 L. Ed. 2d 318 (same); see also Ring, supra, at 588-589, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (Sixth Amendment" does not permit a defendant to be 'expose[d]...to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone"(quoting Apprendi, supra, at 483, 120 S.Ct. 2348, 147 L.Ed.2d 435; alterations in original.)

The High Court has embraced this 19th-century common law rule based not only on a judgment that it reflects the understanding in place when the Sixth Amendment was ratified, but also on the "need to give intelligible content to the right of jury trial." (186L.Ed.2d 337) Blakely, supra, at 305 124 S. Ct. 2531, 159 L. Ed. 2d 403. As the late, Justice Scalia wrote in Apprendi, it is unclear "what the right to trial by jury does guarantee if...it does not guarantee...the right to have a jury determine those facts that determine the maximum sentence the law allows."530 U.S., at 498-499, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (concurring opinion).

After all, if a judge's fact-finding could authorize a sentence beyond that allowed by the jury's verdict alone, the jury trial would be "a mere preliminary to a judicial inquisition into the facts of the crime the State actually seeks to punish." Blakely, supra, at 306-307, 124 S.Ct.2531, 159 L. Ed.2d 403. The Framers clearly envisioned a more robust role for the jury. They appreciated the danger inherent in allowing "justices...named by the crown", the common law "wisely placed th[e] strong...barrier, of... trial by jury, between the liberties of the people, and the prerogative of the crown." Ibid. The Sixth Amendment therefore provided for trial by jury as a "double security, against the prejudices of judges, who may partake of the wishes and opinions of the government, and against the passions of the multitude, who may demand their victim with a clamorous precipitancy." J.Story, Commentaries on the Constitution of the United States 924, p.657 (Abr.1833); see also The Federalist No. 83, p. 499 (C.Rossiter ed.1961)(A.Hamilton)(discussing criminal jury trial as a protection against "judicial despotism"). The Courts holdings that a judge may not sentence a defendant to more than the jury has authorized properly preserve the jury right as a guard against judicial overreaching.

Here, pursuant to U.S.S.G. sec. 3D1.2(d), using the application of the grouping rules, Petitioner's base offense level for all counts was 12, which would yield a sentence of anywhere from 10 to 12 months in prison. See Doc 17 (PSI, at 121). No additional finding of fact was "essential" to any punishment within the range. After rendering the verdict, the jury's role was completed, it was discharged, and the judge began the process of determining where and within what range to sentence Petitioner. Rather than sentencing the Petitioner within the verdict range, this Court make several additional finding that increased Petitioner's base offense level from 12 to 36, and moved his sentencing range from 10 to 12 months, to 188 to 235 months. This was unconstitutional. See Alleyne v. United States, 133 S. Ct. 2151 (2013)(holding; "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury").

This case is typical of so many cases in which the Court was masked to make findings requisite to the sentence that the Court is now not permitted to do. Many of these situations are partially the result of ineffective counsel, infra, which led to the imposes of an unconstitutional sentence. In Blakely the Supreme Court, in an effort to give intelligible meaning to a defendant's Sixth Amendment jury trial rights, made a finding forever changing our bedrock understanding of this most important of right, namely the right to have any and all aspects which affect the amount of liberty a defendant might lose to be included in the indictment and proven to a jury beyond a reasonable doubt.

Because the judicial findings here, increased both the penalty sentencing floor and ceiling to which the Petitioner was subjected, they were elements, which had to be found by a jury beyond a reasonable doubt. The Court, rather than the jury, found the additional elements, and in doing so violated Petitioner's Sixth Amendment rights.

FOURTH ISSUE:

> WHETHER THE COURT VIOLATED DEFENDANT'S FIFTH AMENDMENT RIGHT TO SPEEDY SENTENCING BY THE FOUR YEAR DELAY IN SENTENCING THE DEFENDANT

Petitioner pled guilty and signed his Plea Agreement on 07/17/2009 and the pre-sentencing report was completed on or about 11/10/2009. However, Petitioner was not sentenced until 12/10/2013. Petitioner argues that the court violated his Fifth Amendment right to a speedy sentence by the Court's four year delay in conducting the sentencing hearing. Trial counsel did not raise an objection in this Court relating to Petitioner's right to a speedy sentencing. Thus, his claim should be review under plain error. United States v. Hogg, 723 F.3d 730(6th Cir. 2013); United States v. Williams, 641 F. 3d 758,(6th Cir.2011)("even though plain-error review might have been available for this claim, we will not apply the plain-error standard unless requested to do so by one of the parties").

In Johnson v. United States, the Supreme Court articulated the standard for plain error review:
> (B)efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect(s) substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect(s) the fairness, integrity, or public reputation of judicial proceedings. 520 U.S. 461, 466-67, 117 S. Ct. 1544, 137 L. Ed. 2d 718(1997)(citation and internal quotation marks omitted).

"(T)o determine whether a defendant has been deprived of (his) due process right to a prompt sentencing, the Court must consider (1) the reasons for the delay as well as (2) the prejudice to the accused." United States v. Sanders 452 F.3d 572(6th Cir. 2005)(citing United States v. Lovasco, 431 U.S. 783, 790, 97 S. Ct. 2044, 52 L. Ed. 2d 752(1977))(internal quotation marks omitted). These considerations are not evaluated independently as prongs in a muti-part test, but rather as "related factors to be weighed in light of other and the surrounding circumstances." See id.

A. Reasons for the Delay

In considering the reasons for the delay, the Supreme Court has instructed that "different weights should be assigned to different reasons." Vermont v. Brillon, 556 U.S. 81, 129 S. Ct. 1283, 1290, 173 L. Ed. 2d 231(2009)(citation omitted)(in the speedy trial context). While "deliberate delay to hamper the defense weighs heavily against the prosecution, more neutral reasons such as negligence or overcrowded courts weigh less heavily but nevertheless should be considered...."United States v. Ray, 578 F.3d at 200(2d Cir. 2009). Courts should also consider the extent to which the defendant should bear responsibility for the delay. See id.

In the instant case, a large portion of the roughly four year delay before sentencing was due to the Government's inability to provide the Probation Department with certain evidence for calculating restitution and to allow for the Petitioner to aid the Government in obtaining convictions for numerous Public Officials. The Government meticulously and deliberately took their time to ensure their success. In each case in which the Petitioner was required to testify, the Government spent weeks and sometimes months crafting Petitioners' testimony to make certain that Petitioners' testimony would be air-tight, all the while holding the Petitioner in a state of sheer duress as to his future undetermined term of incarceration. A term of incarceration which was made clear to Petitioner, rested solely upon the Government's arbitrary assessment of his testimony. It should be noted that, not one day of delayed sentencing was attributable to any actions by the Petitioner, but rather all delays were solely attributable to the Government's desire to use the Petitioner for its own benefits and to achieve its desired ends.

B. Prejudice

"To prove a due process violation as a result of a sentencing delay, the prejudice claimed by the defendant...must be substantial and demonstrable." United States v. Ray, 578 F.3d at 200(citing Perez v. Sullivan, 793 F.2d 249, 256(10th Cir. 1986); United States v. Nelson-Rodriquez, 319 F.3d 12, 61(1st Cir. 2003)). A defendant is prejudiced by a sentencing delay when imposing the sentence would interrupt his reintegration into the community "in a way the immediate imposition of sentence would not have." Id. at 201.

First, the Petitioner's ability to challenge the validity of his guilty plea was prevented by the Government four year delay in sentencing him. Petitioner was charged in a federal information document on June 12, 2009. On July 17, 2009, Petitioner appeared in District Court and entered a plea of guilty to the nine count information. His plea agreement was signed on July 17, 2009 as well. Thereafter, the government moved to postpone sentencing for over four years which thwarted Petitioner's ability to challenge the legitimacy of the guilty plea and the plea agreement itself. Prior to entering the plea agreement, the Petitioner had no opportunity to review the accusations in each charge and ascertain where the evidence for said charges was extracted. Petitioner was given very little to no legal counseling, during the less than 24 hour between filing of the information and the Government's June 11, 2009, letter informing trial counsel and the Petitioner that it would be filing an Information charging sheet on June 12, 2009, and therefore, Petitioner had less than 24 hour to inform the Government on accepting its plea agreement that was being fax to trial counsel's office on June 11, 2009.

Had Petitioner been timely sentenced in December of 2009, he could argue on direct appeal, that given trial counsel's inadequate investigation of the plea charges and the unlawful use of the evidence obtained under immunity, his guilty plea

should be vacated. Additionally, Petitioner could have moved to vacate his plea based on prosecutor misconduct, based on the improper use of statements obtained in violation of his Fifth Amendment right against self-incrimination.

Secondly, had the Petitioner been properly sentenced in December of 2009, he would have been in a good position to demand that the Government should have filed a 35 motion based on his four year of post-sentencing assistance to the Government. Petitioner's exhibit [C], post-plea assistance to the Government.

Finally, Petitioner argues that the uncertainty of his fate left him "in limbo" with respect to employment prospects and his ability to make future arrangements for his family. Indeed, delay in sentencing "postpones the commitment of the defendant to corrections facilities, may have a detrimental effect on rehabilitation, and suspends the appellate review of error."Ray, 578 F. 3d at 198. Petitioner waited over four years for a sentencing hearing, all the while remaining in home detention. Despite that fact, Petitioner took steps towards rehabilitation, such as reestablishing ties with his family and helping the Government convict and recover hidden assets from public officials and others. Further, hoping that his involvement with the criminal justice system was behind him, Petitioner obtained employment and paid taxes, help supported his family. Petitioner did his best to fully reintegrate back into society. Moreover, given the total circumstances of the several delays in Petitioner's surrender date, Petitioner and his family undoubtedly had such a transition period that should warrant some consideration.

UPCOMING RULING:

Whether the Sixth Amendment's speedy Trial clause apply to the sentencing phase of a criminal prosecution, protecting a criminal defendant from inordinate delay of final disposition (as the case at bar), is a question of national important being consider by the United States Supreme Court in Betterman v. Montana, U.S.., No. 14-1457, cert. granted on 12/04/2015. Petitioner suggests that this is an unusual case where the dictates of fundamental fairness clearly compel the Court to conclude that the Petitioner's rights were violated.

FIFTH ISSUE:

> THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL
> WAS VIOLATED BY TRIAL COUNSEL'S ERRORS, OMISSIONS AND MISREPRESENTATIONS

A. Trial Counsel's Failure To File A Timely Notice Of Appeal Was Ineffective Assistance Of Counsel:

On the day of sentencing the Petitioner advised his attorney that he desired to file a direct appeal. The petitioner knew, but did not disclose to his defense counsel that he was most unhappy with the criminal proceedings and counsel's performance and was clearly determined to seek an appeal of those issues, including, inter alia, the plea agreement and restitution judgment.

The matter of an appeal was discussed at the end of the sentencing hearing. The Court advised the Petitioner that he had waived his right to appeal as part of the plea agreement and the Petitioner asked his attorney whether an appeal nevertheless would be filed on his behalf, to which counsel responded, "You waived your right to appeal." See Petitioner's exhibit [F]. However, as will be shown below, this was an incorrect statement of law.

Although Petitioner admits that trial counsel tried to persuade him even to this day that the Court is right that he could not appeal because of the waiver in the plea agreement, see Petitioner's exhibit [D]. This Circuit has held to the contrary. See Campbell v. United States, 686 F. 3d 353 (6th Cir. 2012). In Campbell, the Court of Appeals for the Sixth Circuit confronted the question of whether Campbell's 2255 motion should have been grant by the district court on his claim that trial counsel render ineffective in failing to file a notice appeal, despite the waiver in his plea agreement. In vacating the district court's denial of Campbell's 2255 motion, the Court held that; "An attorney is ineffective when he or she fails to file a requested notice of appeal even though as part of a plea agreement, the defendant had partially waived his right to appeal. Id.

The Campbell decision looked to three inquiries that must be answered in the present type of case. First, a court must determine if the client directly asked his lawyer to file an appeal. An attorney who does not file a notice of appeal when specifically asked to do by his or her client acts a professionally unreasonable manner per se. Id. In such a situation, prejudice is presumed. Id. Such prejudice exists even when the client waived his appeal rights as part of a negotiated plea. Id.

Second, even when the client has not made a specific request that the lawyer file an appeal, a court still must determine whether the attorney consulted with the client regarding the advantages and disadvantages of appealing. While engaging in this consultation, the lawyer must make a reasonable effort at determining his or her client's wishes. If such consultation took place, the lawyer acted unreasonably only if he ignored the client's wishes to appeal. Id.

Finally, a court also needs to inquire whether the attorney had the affirmative duty to consult with the client. An attorney has such a duty when either (1) A rational client would want to appeal, or (2) This particular client reasonably demonstrated an interest in appealing. Id. Campbell was remanded for an evidentiary hearing of the sort conducted in the present case. Accordingly, Campbell control the disposition of this issue. As such, the Petitioner is entitled to an out-of-time appeal.

B. Defendant's Plea Agreement Was The Product Of Ineffective Assistance Of Counsel:

Petitioner argues that trial counsel constitutionally ineffective in his failure to recognized that the Court failed to conduct a proper inquiry, as required by Federal Rule of Criminal Procedure 11 ("Rule 11"), into whether Petitioner could knowingly and voluntarily plead guilty, in light of his use of prescription medication for depression and the Government's misuse of proffer information. See United States v. Dominguez Benitez, 542 U.S. 74, 124 S. Ct. 2333, 159 L. Ed.2d 157 (2004).

Petitioner's proffer agreement was signed and dated for October 10, 2008. At the time of his proffer session the Petitioner had no been charged with any federal crime whatsoever. In other words, the Government have nothing on the Petitioner prior to him giving the Government self-incriminating information during the proffer sessions. Petitioner's criminal information was not filed until on or about July 9, 2009, 10 months after Petitioner's proffer sessions. See Petitioner's exhibit[H].

Rule 11 requires that "(b)efore accepting a plea of guilty or nolo contender, the court must... determine that the plea is voluntary." Fed. R. Crim. P.11(b)(2). "(A)lthough the procedure embodied in Rule 11 has not been held to be constitutionally mandated, it is designed to assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary." McCarthy v. United States, 394 U.S. 459, 465, 89 S. Ct. 1166, 22 L.Ed.2d 418(1969)(footnote omitted). "A defendant who enters a [guilty plea] simultaneously waives several constitutional rights...For this waiver to be valid under the Due Process Clause, it must be an intentional relinquishment or abandonment of a known right or privilege. Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void." Id. at 466(internal quotation marks and citation omitted).

The district court must exercise particular care to ensure that a guilty plea is knowing and voluntary when the defendant has recently consumed a potentially impairing substance. "Once the district court learns that a defendant has recently ingested a substance capable of impairing his ability to knowingly and voluntarily plead, it must make an additional inquiry regarding the defendant's competence." United States v. Winnick, 490 F. App'x 718, 719-20 (6th Cir. 2012)1(citing United States v. Parra-Ibanez, 936 F.2d 588, 596 (1st Cir. 1991); United States v. Cole, 813 F.2d 43, 46 (3d Cir. 1987)). Winnick reflects that the Rule 11 inquiry is not a rote series of questions but instead must be calibrated to the particular defendant and situation to ensure a guilty plea is entered knowingly, voluntarily, and intelligently.

In Winnick,
> [T]he district court asked Winnick whether he was under the influence of any drugs or alcohol. Winnick answered that he had taken his 'psych meds' the night before. The district court responded, '[m]ay I assume, sir, that those medications help you understand the proceedings?' Winnick answered, 'Yes, ma'am.' The district court then asked defense counsel whether he thought Winnick understood what was happening during the plea colloquy. Defense counsel said yes. Winnick said later in the colloquy that he understood everything in the please agreement. Id. at 719. We concluded that the inquiry complied with Rule 11 because when the district court learned that Winnick had taken medication, the district court asked the "critical question" of whether Winnick's psychiatric medications helped him understand the proceedings. Additionally, we noted that "there [wa]s no indication here that the district court had any knowledge of the defendant's history of mental illness at the time of the plea colloquy" and Winnick's behavior did not suggest that he was not competent or was not entering his guilty plea knowingly and voluntarily. Id. at 720.

First, Petitioner argues that the Court did not sufficiently inquire into the effects of the medication Petitioner had taken the night before his prompt plea colloquy. General once a court learns that a criminal defendant has recently ingested a substance capable of impairing his or her ability to knowing and voluntary plead, it must make an additional inquiry regarding the defendant's competence. See United States v, Parra-Ibanez, 936 F. 2d 588, 596 (1st Cir. 1991); United States v. Cole, 813, F. 2d 43, 46 (3d Cir, 1987).

In support of his argument that the Court's inquiry into the effects of his "psych meds" was inadequate, Petitioner relies on Cole and Parra-Ibanez. In Cole, upon learning that the defendant had ingested drugs the night before the plea colloquy, the court failed to ask anything more about the drugs. 813 F. 2d at 45. In fact, the record was unclear whether the court noticed the defendant's admission of drugs use at all. Id. at 46. In Parra-Ibanez, after learning that the defendant had taken medication less than 24 hours before the plea colloquy, the court merely asked what medication the defendant was taking and whether the medication helped the defendant control his nerves. 936 F. 2d at 591. Though the district court later inquired into the defendant's general ability to understand the proceedings, it never asked about the specific impact of the medication on defendant's competence. Id. at 592. In concluding that such an inquiry was insufficient, the First Circuit explained that the district court's previous knowledge of the defendant's history of drug use, depression, and attempted suicide, obtained through a competency hearing only a week before the plea colloquy, "enhanced" the obligation of further inquiry. Id. at 596 n. 16.

In the case at bar, at no point in the discussions with Petitioner did attorney even advise that he had an express 6th Amendment Right to require the Government to prove, beyond a reasonable doubt that the evidence contained in the information was derived from a legitimate source. Despite the fact that these rights were established as far back as United States v. Kick, 584 F.2d 773 (6th Cir. 1977). See Petitioner's exhibit [D].

As stated earlier in this motion, Petitioner had less than 24 hours to decide whether or not to accept the Government's plea agreement or face being indicted by the Government and losing the benefits of his proffer sessions. No lay person could possibly comprehend the legal ramifications of a complicated plea agreement in such a short span of time. To compound the situation, trial counsel provided no legal advise or analysis of the situation or evidence used to support the charges in the pending information charge sheet or the source of said evidence and its legitimacy. Further, trial counsel failed to expressly advise the Petitioner that he had a right to attack the Court's judgment and his sentence on direct appeal and or collateral review and that the rights to such challenges might be foreclosed by the language in very plea agreement either have the time to review, but encouraging him to sign nevertheless. The same hold true in the case at bar.

Secondly, a investigation into the legitimacy of the evidence cited in the plea agreement was critical in as much as said evidence appears to have been extracted from Petitioner's debriefing sessions. As explained earlier, neither before or during

did anyone advised Petitioner of his Miranda Rights. Further, it was the Petitioner's understanding that the information given during debriefing would not be used in a prosecution against the Petitioner. If these facts are correct, the plea agreement violates both the Miranda rule and Petitioner's Fifth and Sixth Amendment Rights. "[T]he special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." Rhode Island v. Innis, 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); see also United States v. Montano, 613 F.2d 147, 149 (6th Cir. 1980).

Finally, at a hearing Petitioner will demonstrate by new evidence, not in the record, that credible challenges existed to some of the Government's assumptions set forth in the information charge sheet and enhancing factors employed by the Court. It will be shown that if the Petitioner had been correctly advised of his rights to jury determination of elements beyond a reasonable doubt of the facts which ultimately led to his plea and increased his sentence; the Petitioner would not have entered the plea at all, and rather proceeded to trial.

In the instant matter, Petitioner's defense counsel failed to provide him with the minimal requisites of effective representation as required by the Sixth Amendment and the U.S. Supreme Court's holding in Lafler v. United States, 132 S. Ct. 2151 (2012). Trial counsel failed to provide the basic and honest advice required for Petitioner to make a knowing plea and waiver decision and provided misleading and coercive advice intended to manipulate Petitioner into entering a prompt plea, thereby creating a circumstance under which no plea of guilt could have ever been voluntary.

SIXTH ISSUE:

### IMPROPER USE OF EVIDENCE OBTAINED FROM DEFENDANT'S DEBRIEFING SESSIONS

"[A]ny statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty" is not admissible against the defendant who "was a participant in the plea discussions." Fed. R. Evid. 410; see also Fed. R. Crim. P. 11(f)(providing that the admissibility of any plea, plea discussion, or any related statement is governed by Rule 410). However, a defendant may waive his rights under Rule 410 and Rule 11, and allow the Government to introduce statements made in the course of plea discussions, "as long as there is no 'affirmative indication that the agreement [to waive] was entered into unknowingly or involuntarily." See United States v. Hardwick, 544 F. 3d 565, 569-70 (3d Cir. 2008)(quoting United States v. Mezzanatto, 513 U.S. 196, 210, 115 S. Ct. 797, 130 L. Ed.2d 697(1995)). Here, Petitioner's proffer agreement provided that the Government could use at trial statements that Petitioner made during the debriefing sessions, in the event that Petitioner were to make representations at trial inconsistent with those he had made during the proffer sessions.

In this case, prior to his information sheet being filed, Petitioner and the Government entered into a written proffer agreement, in earlier 2009. The Petitioner's understanding of the agreement are as follows:

> I have indicated that I wish to provide certain information to law enforcement personnel concerning my knowledge of criminal activity of certain city officials and others doing business with said persons. I agree that anything I may say to federal or state law enforcement personnel pursuant to this agreement, may be used for any purpose, including but not limited to, use in any state or federal criminal prosecution with the following exception:...However, the United States agrees it will not introduce in a criminal prosecution of me, in its case-in-chief at trial, any of the statements I make pursuant to this agreement.

Given that fact, Petitioner now objected to the use in determining his sentencing guideline range of any information obtained from Petitioner's proffer sessions. Petitioner based his objection on sec. 1B1.8 of the guideline:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of other, and as part of that cooperation agreement the government agrees that self incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement. U.S. Sentencing Guidelines Manual sec. 1B1.8(a)(2007).

While the Government will argue that the language of the proffer agreement permits the use of the Petitioner's statements to calculate his guideline range, the Court should disagree and find that the proper interpretation of sec. 1B1.8 requires that any such agreement specifically refer to the Court's ability to consider the defendant's statements in such calculation. See United States v. Cobblah, 118 F. d 549 (7th Cir. 1997)(explaining that a proffer agreement is a contract governed by its express terms); see also United States v. Miller, 910 F. 2d 1321 (6th Cir. 1990). Because Petitioner's proffer agreement does not, the Court was unable to use Petitioner's statements in arriving at his advisory guideline range. Therefore, Petitioner respectfully moves the

Court to vacate his sentence and resentenced him without any information from his proffer sessions.

LAST ISSUE: The Court Must Conduct An Evidentiary Hearing

When a court grant 2255 relief in order to allow a criminal defendant to have an out-of-time appeal, the usual course of action is to vacate the original judgment, reinstate that judgment, and then give the defendant the right to fill a timely notice of appeal.

However, in this case, there are two reasons why this Court must conduct an evidentiary hearing prior to giving the Petitioner the out-of-time appeal to which he is entitled. First, as set forth in Petitioner's 2255 motion, it now appears that this Court imposed an illegal sentence and restitution judgment upon Mr. Pumper back in 2013. The Court was told by the lawyers that the counts of conviction carried a terms of 97 months, advice that turns out to be incorrect. The Court must conduct an evidentiary hearing in which this issue and the issue concerning the restitution judgment may be addressed.

Furthermore, an evidentiary hearing is also required because new facts have come to light since the time that the court originally imposed sentence and judgment upon defendant. Additionally, both counsel for the Government and the trial counsel are in possession of key evidence and materials relevant to the disposition of appeal which they have refused to disclose. This evidence and materials are outside of the record and therefore an evidentiary hearing is required for disclosure and adequate development of the record. 28 U.S.C. sec. 2255 provides Federal prisoners with a means to secure a second look at the legality of their conviction and sentence, beyond direct appeal of right. See Ajan v. United States 731 F.3d 629 (6th Cir 2013).

A post-conviction proceeding constitutes a civil collateral attack on a criminal judgment whereby a criminal defendant may obtain review of constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues are not contained in trial record. See United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996). (holding: "To be entitled to an evidentiary hearing, a defendant must assert a colorable claim that raises disputed issues of material fact.")

To show his trial counsel's deficiency, petitioner has gathered evidence outside the record, see Petitioner's Exhibits, and presented sworn deposition testimony that show his trial counsel's lack of legal competency and his lack of preparation in seeking to undermine the Government's Theory of criminal conduct embodied in the indictment.

Given these facts, it is possible that counsel was deficient, but the presumption of competency that attaches to trial counsel cannot be overcome in this case without some factual development through an evidentiary hearing under 2255, the preferred mode of resolving a claim of ineffective assistance of counsel based on materials outside the record. See Northrop v. Trippett, 265 F. 3d 372 (6th Cir. 2001); see also Lucas v. O'Dea, 179 F. 3d 412 (6th Cir. 1999). Accordingly, Petitioner is entitled to an evidentiary hearing.

CONCLUSION

The Petitioner is before this Court seeking to vacate the Court's restitution judgment and his existing sentence because the United States Constitution and the U.S. Supreme Court said the manner in which the judgment and sentence were imposed violated certain important Rights of the Petitioner; namely the Petitioner's Right to have all factors that could deny or further deny his liberty to be included in his charging instrument, admitted to specifically or presented to a jury and proven beyond a reasonable doubt.

WHEREFORE, the Petitioner respectfully moves this Court to correct both his restitution and sentence in a manner protective of his constitutional rights and further seeks any and all other relief to which he is entitled.

Respectfully submitted,

Steven W. Pumper
Reg No. 32320-160
FCI Morgantown
P.O. Box 1000

Morgantown, WV 26507

CERTIFICATE OF SERVICE

 I, do hereby certify that the above true and correct foregoing document titled "Defendant's 2255 Motion" was provided to the Clerk of the Court at the address below. I further certify that it is the Petitioner's understanding that the clerk is to served the document upon the United States pursuant to 2255, Rule 3(b) and Rule 4(a). All copy deposited, postage prepaid, and placed into the prison legal mail service on this, the 3rd day of March, 2016.

Clerk of the Court Office
United States District Court

Steven W. Pumper
Reg No. 32320-160
FCI Morgantown
P.O. Box 1000
Morgantown, WV 26507